HILLS et al. v. MACKILL et al.

(District Court, S. D. New York. November 24, 1888.)

1. SHIPPING—CARRIAGE OF GOODS—NEGLIGENT STOWAGE.
It is the ship's duty to take all the precautions that experience shows to be necessary to avoid injuries to cargo liable to arise on the voyage. If the best customary means are not employed, it is at her risk.

2. SAME—MOVABLE BULK-HEADS—COAL DUST.
On a voyage from Messina, filberts in bags were stowed against a movable wooden bulk-head separating the compartment from the coal bunkers, through which an extraordinary amount of coal dust penetrated, and injured the nuts. The bulk-head was covered by Chinese matting, which is often used for such purposes; but canvas is equally used, and is better, because tighter. Held, that coal dust is not a sea peril, and that the ship was liable for the damage, for not using canvas as the best protection, as well as for putting the bags next to the bulk-head, instead of other cargo less liable to be injured.

3. SAME—DUTY OF CONSIGNEE—OVERHAULING DAMAGED CARGO.
Consignees are not bound to overhaul and repair damaged goods for the ship's benefit, rather than sell them at auction as damaged goods, where the ship's agents have opportunity to do the same work.

In Admiralty.

Libel by John Hills and others against Robert Mackill and others for damages arising from injury to cargo of the steam-ship Ettrickdale.

Scudder & Carter and Geo. A. Black, for libelants.

E. B. Convers, for respondents.

BROWN, J. The above libel *in personam* was filed to recover for damages to 278 bags of filberts, injured by coal dust on a voyage of the steamship Ettrickdale from Messina to New York. The bags were stowed in the lower hold, compartment No. 2, and against the bulk-head that separated that compartment from the coal bunkers. The other bulk-heads of the steam-ship were of iron, and fixed. This one was made movable, for the purpose of enlarging or contracting the size of the coal bunkers, and was therefore constructed of wood. Between-decks, the planks of which it was made were 2½ inches thick; in the lower hold they were 3 inches thick. They were placed perpendicularly, and tongued and grooved together. Before the cargo was loaded, Chinese matting was nailed upon the cargo side of the bulk-head, the ends of the mats lapping, and being fastened by means of laths. On delivery at New York, the 278 bags were found so black with coal dust, which had also penetrated inside and among the nuts, that they were not merchantable, except as damaged goods. A part of the bags were overhauled, and made merchantable by the libelants; but, on learning that the respondents would not admit their liability for this damage, the libelants refused to take further pains about the rest, and they were sold at auction as damaged, on notice to the respondents.

The respondents contest their liability for the damage on the ground that the bags were stowed in the usual manner, and that there was no negligence on their part; that the bulk-head was well constructed, and of the kind in ordinary use in similar steam-ships, and protected on the inside by matting, in the customary way. Some testimony was given by the libelants to the effect that after arrival in New York there was an opening between the planks of the bulk-head wide enough to insert the fingers. Upon other testimony in the case, however, I am not satisfied of the correctness of this testimony. The master states that the seams of the bulk-head were caulked at Messina. Other witnesses state that on arrival at New York the oakum had worked out in part, and was seen hanging from the cracks. The vessel experienced very heavy weather during her voyage in the month of December, and the respondents contend that this was the only cause of the unusual amount of dust that worked through from the coal bunkers. On a voyage not long previous the ship had carried a cargo of coal, but it was claimed that the compartments were subsequently thoroughly washed. This ship was a common carrier. There is no dispute that the goods were received by her in good order. She was bound by her contract, as well as by the law, to deliver them in like good order, unless she proves the damage to be within some of the recognized legal exceptions to her liability. There is no exception in the bill of lading applicable to the case other than the general exception of "sea perils." Damage from coal dust is not, at least directly, a damage from sea perils. If a ship is sea-worthy at the start, and performs her whole duty in properly stowing and protecting the goods against the dangers likely to be incurred on the voyage, subsequent damage arising from unusual rolling or pitching in extraordinary weather is, doubtless, damage arising from a peril of the sea. So, where a fixed

custom permits the stowage of different kinds of goods together, damage that arises from their injuring each other during extraordinary weather is held one of the perils of navigation assumed by the shipper, and within the ordinary exception of the bill of lading, if they are well stowed; otherwise not. In this case the customary use of movable wooden bulk-heads in steam-ships of this character is sufficiently proved. So far the ship was not unfit for the voyage. That some coal dust is ordinarily liable to work through the bulk-head is well known. *The Thomas Melville*, 31 Fed. Rep. 486, 488. It was proved that, to prevent the working of coal dust into the adjoining compartments, matting was in some cases used; in other cases, canvas; and that the latter is best, because tightest. There was no definite custom in this respect. In stowing cargo against the bulk-head, through which coal- dust was likely to find its way, it was the duty of the ship to take all the precautions that experience had shown to be necessary to avoid injury; having reference to the kind of bulk-head she had, and to its condition at that time. If the best-known means were not adopted, it was at her risk, and not at the risk of the goods. It was the ship-owner who had charge of the loading, and who was to determine which parts of the cargo, if any, should be placed near that bulk-head. If the coal dust was liable to penetrate the bags of filberts, they should have been stowed further away from the bulk-head; or else adequate protection should have been used by canvas coverings, such as are often used to protect other kinds of cargo, or the bulk-head itself covered with tight canvas. *The Marinin S.*, 28 Fed. Rep. 664, 32 Fed. Rep. 918. The owner of the goods has no control over such matters. Under the law that imposes on the ship, as carrier, the duty of safe delivery, the ship takes all such risks, unless she can show the use of all reasonable skill and good judgment, or compliance with so definite a usage in the stowage and protection of the goods against injury, and such use of the well-known and best means to that end, as legally import an assent of the shipper to transportation in this manner. *Baxter* v. *Leland*, 1 Blatchf. 526; *The Sabioncello*, 7 Ben. 357; *The Maggie M.*, 30 Fed. Rep. 692. The evidence does not show such care, either as regards the choice of goods to be put next the bulk-head, or as to their protection against dust; and the ship is not, therefore, legally excused. The amount of coal dust that came through was extraordinary. It covered, more or less, all the cargo that was stowed in that compartment, though the rest may not have been damaged by it. There is room for doubt whether the master is not mistaken as to the caulking of the bulk-head at Messina, and whether, at the time he testified, he had not confounded that with the caulking at New York, which was entered in the log, while the log does not show any caulking at Messina. Upon the question of fact, considering the amount of damage done by the coal dust, I should find it difficult to believe that the bulk-head was made as tight as usage requires, either by caulking, or canvas, or matting.

As respects the bags sold at auction, the respondents had full notice, and, so far as appears, could have overhauled them themselves, or have procured this work to be done by others, had they chosen to do so. They

had no right, I think, to demand that the libelants should do this work, rather than have the goods sold at auction. The analogy drawn. from the repair of vessels damaged by collision is not, I think, applicable. So far as I know, it has never been applied to damaged goods; and the circumstances, as respects the facilities of sale, and the means of obtaining the proximate value of the damaged articles, are wholly different. Unless there is some dispute, therefore, as to the result of the auction sale, or some unfairness is charged in regard to it, the libelants may take a decree for the amount claimed, with interest and costs. If there is dispute on these points, a reference may be taken to ascertain the damages.